IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Robert M. Leonard (RL 9768)
Melissa L. Klipp (MK 7772)
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, New Jersey 07932
(973) 360-1100

Attorneys for Plaintiff
LEAP Systems, Inc.

| | |
|---|---|
| LEAP SYSTEMS, INC.<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MONEYTRAX, INC.,<br>and NORMAN BAKER, an individual,<br><br>　　　　　Defendants. | Civil Action No. 05cv1521(SRC)<br><br><br>**SECOND AMENDED COMPLAINT** |

For its Second Amended Complaint, Plaintiff LEAP Systems, Inc. ("LEAP") alleges as

follows:

### THE PARTIES

1.　　　LEAP Systems, Inc. ("LEAP") is a corporation organized and existing

under the laws of the State of New Jersey with its principal place of business at 1170 U.S.

Highway 22, Suite 204, Bridgewater, NJ 08807.

2.　　　Norman Baker ("Baker") is an individual, last known to have been a

citizen and resident of Texas.

3.      MoneyTrax, Inc. ("MoneyTrax") is a corporation with its principal place of business in Mandeville, Louisiana.

## JURISDICTION

4.      Jurisdiction is conferred on this Court pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121; 28 U.S.C. §§ 1331, 1332, and 1338 for the claims arising out of the violations of Section 43(a) of the Lanham Act, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the claims arising under New Jersey law.

5.      The matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties.  This Court also has jurisdiction over the persons of the defendants, making venue in this District proper pursuant to 28 U.S.C. § 1391(a)(3).

## STATEMENT OF OPERATIVE FACTS

### LEAP Systems' Business

6.      Through a proprietary system developed exclusively for its licensees, LEAP provides asset coordination, strategy and financial improvement methodologies.  LEAP is well known throughout the United States and is generally regarded as an industry leader in the provision of its methodology and techniques through a strictly enforced license arrangement with thousands of licensees nationwide.

7.      Robert Castiglione, President of LEAP, has for many years been a leading figure in the United States in the business of providing advice, techniques and consulting for the insurance and financial services industry, and for inventing innovative approaches to wealth

growth and management through the unique coordination and integration of assets and cash flow positions with life insurance.

8.  Over the preceding 15 years, Mr. Castiglione and LEAP have developed a series of proprietary and confidential materials, which collectively are known as the "LEAP System." The LEAP System contains, among other things, confidential and/or proprietary materials constituting the primary assets of LEAP's business. LEAP's confidential and/or proprietary information includes, without limitation, the know-how, methodology, techniques, procedures, processes, and programs embodied in and including LEAP's software system, training methods and materials, LEAP manuals, money moves, calculators, workbooks, worksheets, video and DVD segments, live training seminars, as well as proprietary information regarding pricing, costs, margins, distribution systems, marketing methods, corporate relationships, and proprietary names and contact information for Licensees and corporate accounts (LEAP's "Proprietary Information").

9.  LEAP's Proprietary Information offers an unprecedented and unique approach to money management and growth.

10.  LEAP strictly enforces the degree to which any of its Proprietary Information is shared, and does not make the Proprietary Information directly available to any person or entity except upon the terms and conditions of a limited license expressed in a LEAP System License Agreement, which all licensees of the LEAP System are required to execute and obey. Licensees of LEAP's Proprietary Information pay LEAP for the privilege of using LEAP's Proprietary Information and are obligated by the terms of the LEAP System License Agreement.

11.     Given the complexity of LEAP's Proprietary Information, LEAP licensees undergo a three-tiered training process to become proficient in the system and its techniques. This process ordinarily takes several years to complete.  LEAP's Proprietary Information is the foundation of its training methods.

12.     The LEAP licensee must execute a license agreement, review an extensive proprietary manual, view numerous proprietary video segments and attend six (6) to ten (10) live training events to become fully skilled in the methods of LEAP, and to become familiar with it proprietary methods.

13.     Defendant Baker, a former LEAP licensee and National trainer, helped devise a significant part of LEAP's strategy in limiting access to LEAP's Proprietary Information, including the creation of software training classes (that require live training) to limit access to written materials.   The training materials and training information developed by Leap, to which Baker contributed for the sole benefit of LEAP and was given access, are highly proprietary, explain in depth LEAP's Proprietary Information, and are shared with very few high level executives and trainers, including Baker.  The software training materials are not available to the general public, are not distributed to LEAP licensees, and are closely protected.

### Norman Baker and His Obligations to LEAP

### The Baker Consultancy Agreement

14.     Baker, doing business as Maxe Software, entered into an Agreement on January 1, 1991 with LEAP, formerly known as Executive Asset Management Inc. (Exhibit A hereto) (the "Consultancy Agreement").  Therein, Baker agreed to design, develop, update, market and promote a "computer software program  . . . that expresses the concepts outlined in the Licensed Works and the Licensed System as [LEAP] shall from time to time request."

15.    Pursuant to the Consultancy Agreement, Baker agreed that LEAP would own all right, title and interest in and to the LEAP System and the software.  In addition, Baker agreed to assign to LEAP any and all rights he may have acquired with respect to the software.

16.    Baker was obligated to deliver a working copy of the Software and the "source code and notes and other necessary items to reproduce the Software at least once every six months."

17.    The Consultancy Agreement provided that:  "Baker acknowledges that the services to be rendered by him are unique and personal.  Accordingly, Baker may not assign any of his rights or delegate any of his duties or obligations under this Agreement without the prior written consent of [LEAP]."

18.    The Consultancy Agreement provides that one of the causes for termination is if "Baker fails to modify, improve, or update the Software according to the requests of [LEAP] for such modifications, improvements, or updates, however, the modifications, improvements, and updates must be of a reasonable nature in order to sustain the Software as a marketable product to the Licensees."

19.    The Consultancy Agreement further provides that "BAKER shall indemnify and hold harmless [LEAP] and all employees or other agents of [LEAP] from and against any and all damages, claims, losses, liabilities and expenses which may arise out of the misconduct or negligence of BAKER or his agents or the breach by BAKER of any term of this Agreement, or which arises in connection with any failure of or inaccuracy in any representation or warranty of BAKER in this Agreement, or which arise in connection with any use or malfunction of the Software."

20.     Attached as an exhibit to the Consultancy Agreement is a Restrictive Covenant and Nondisclosure Agreement executed by Baker in which Baker agreed to do nothing that would infringe upon, contest, or diminish the sole and exclusive property rights of LEAP in the LEAP System.  In addition, Baker agreed to and did assign to LEAP all of his right, title and interest in and to all improvements to, or discoveries, new concepts, writings, designs, tangible manifestations, and work product of all kinds relating to the LEAP System.  Further, Baker agreed to keep all of LEAP's business information confidential and not to use such information other than solely on behalf of and for the benefit of LEAP.  Specifically, the Consultancy Agreement and Restrictive Covenant provide:

(a)     Any and all Business Information (defined as methods, analyses, systems or concepts of the Company in connection with its financial and estate planning business) disclosed at any time to the undersigned by the Company or any of its representatives constitutes valuable property of the Company in which the Company has exclusive rights, and the undersigned shall not, at any time, do anything to infringe upon, contest, or diminish the sole and exclusive property right of the Company in such Business Information;

(b)     The undersigned will hold solely for the Company's benefit, will promptly disclose to the Company and without any additional consideration or compensation, will and hereby does assign to the Company, all of his right , title and interest in and to all improvements to, or discoveries, new concepts, writings, designs, tangible manifestation, and work product of all kinds … relating to, any and all Business Information, made, participated in, conceived or reduced to practice by the undersigned, either alone or  jointly with others, during the term of the Agreement;

(c)     [T]he undersigned shall keep confidential, and shall not divulge to any other person … any Business Information disclosed to or obtained by the undersigned at time during the term of the Agreement;

(d)     The undersigned shall use all Business Information only in connection with providing services for and on behalf of the Company and as expressly authorized by the Company; and at no time, whether during the term of the Agreement or thereafter … shall the undersigned use any such Business Information, disclosed to or obtained by the undersigned during the term of the Agreement, in the furtherance of any business activity or business interest of the undersigned relating to financial or estate planning, counseling or consulting other than solely on behalf of and authorized by the Company;

(e)     The undersigned acknowledges that: The Business Information is unique and . . . of substantial value to the Company and that a breach by him of any of the provisions of this Restrictive Covenant and Non-Disclosure Agreement will cause irreparable damage to the Company for which there is no adequate remedy at law.  Therefore, he acknowledges that the Company shall be entitled to preliminary and permanent injunctive relief to prevent any violation by him of any of the terms and provisions set forth here; and

(f)     Should the Company institute suit against him for injunctive relief and/or damages for any breach of this Restrictive Covenant and Non-Disclosure Agreement, the Company shall be entitled to recover from the undersigned the Company's reasonable attorney's fees and costs of any suit in which the Company is successful in whole or in part.

### Baker's Exposure to Confidential Information

21.     Baker became a LEAP System licensee in 1988; a consultant in 1991, and was engaged, from 1991-2002 by LEAP as its National Trainer for LEAP's software.  During this period of time, Baker became intimately familiar with LEAP's Proprietary Information. Moreover, per the Consultancy Agreement, Baker was responsible for developing LEAP's software system--a core element of LEAP's Proprietary Information.

22.     Over the course of 14 years, Baker worked side-by-side with LEAP executives, and learned business secrets and strategies -- information capable of imparting significant competitive advantage -- known only at the highest levels within LEAP.

23.     As a National LEAP Trainer, and developer of LEAP's software, Baker was integral to LEAP and was imparted with full knowledge of LEAP's Proprietary Information. He possessed training manuals, updated course materials, software and strategy models.  Baker intimately knew LEAP's business secrets as a direct result of his position as a LEAP licensee, consultant, trainer, and software developer.

24.     Baker also housed, at his property in Texas, the proprietary and confidential LEAP database of customers, clients and software.  LEAP entrusted Baker with its

Proprietary Information  on the basis of his fiduciary and contractual relationship with LEAP, and his longstanding relationship with the company and its principals.

25.     Prior to becoming a LEAP licensee and consultant, Baker had little, if any, experience or exposure to LEAP's Proprietary Information, and gained all of his information and knowledge about LEAP's Proprietary Information through his work for and with LEAP.

26.     Prior to his retirement, Baker became a leading voice at LEAP in integrating the development of LEAP's software system in connection with LEAP's Proprietary Information.

27.     LEAP periodically revises its Proprietary Information, and updates, or creates new materials and software in order to stay at the forefront of the industry.   Only current licensees are exposed to certain of these developments and updates.

28.     As a part of his computer consultant and sales representative duties, Baker was exposed to LEAP's current Proprietary Information, including, but not limited to:

(a)     The names and contact information for current LEAP licensees and corporate accounts representatives.  All of LEAP's lists of licensees and corporate contacts are kept strictly confidential in internal computer databases.

(b)     The latest LEAP innovations and concepts, developed and implemented frequently, including but not limited to new money moves and concepts, new worksheets, and new training manuals.

(c)     Innovations in the LEAP software including but not limited to new financial calculators, training materials, and the integration and implementation of updated financial strategies and concepts.

## LEAP's License Agreement with Baker

29.     Baker also executed a LEAP System License Agreement on April 24, 1988, (the "Baker License Agreement") (Exhibit "B" hereto) by which he is still bound, and in which Baker: (1) acknowledged the legitimacy of LEAP's proprietary rights in the LEAP System; (2) agreed to obligated Baker to keep as confidential all information disclosed in connection with the LEAP System; (3) agreed that if he breached the Baker License Agreement, LEAP would be entitled to preliminary and permanent injunctive relief against Baker; and (4) agreed that in addition to injunctive relief, Baker would be liable for damages in the stipulated amount of $300 per day for each day the breach or violation of the Baker License Agreement continued.  Specifically, the Baker License Agreement provides:

8(d)    The Licensee acknowledges that the Licensed System and all information to be disclosed in connection therewith by the Company constitute valuable property rights and trade secrets.  The Licensee also acknowledges the validity of the Company's copyright rights in and to the Licensed System and Licensed Works and shall not in any way do anything that would infringe upon, contest or harm such rights of the Company in the Licensed System or Licensed Works.

8(e)    [T]he Licensee shall keep confidential and shall not divulge to or for the benefit of itself or any other person, entity, partnership, corporation or association any of the Licensed System or the trade secrets obtained from and/or disclosed by the Company under this Agreement.

13(a)   The Licensee acknowledges that the Licensed System and Licensed Works of the Company are unique, are a substantial value and that a breach by the Licensee of any of the terms and provisions under this Agreement may cause irreparable damage to the Company for which there may be no adequate remedy at law.  Therefore, the Licensee acknowledges that the Company shall be entitled to preliminary and permanent injunctive relief to prevent any such violation by the Licensee.

13(b)   The Licensee agrees that the Company will be damaged by any breach and/or violation resulting form [sic] the unauthorized use or distribution of the Licensed System or Licensed Works outside the scope of the License granted hereunder, and that such damages are impossible to measure in money.  Therefore, the Licensee agrees that in addition to injunctive relief, the Company shall be entitled to recover as liquidated damages from the Licensee and not as a penalty for any such breach and/or violation of this Agreement, the stipulated sum of three

hundred ($300.00) per day for each calendar day such breach and/or violation continues unabated.

### Baker's Separation from LEAP and Commencement of Employment with MoneyTrax

30.     In 2002, Baker informed LEAP that he would no longer provide services under the Consultancy Agreement because he was too ill to work and was retiring.  Before his resignation, Baker was timely and completely paid in accordance with the Consultancy Agreement.

31.     Within recent months, however, Baker affiliated himself (by contract, employment or otherwise) with LEAP's primary competitor, defendant MoneyTrax--a self-proclaimed "mini-LEAP."  Defendant MoneyTrax was founded in 1994 by a LEAP licensee, is a direct competitor of LEAP, and provides sales and marketing systems to the life insurance and financial services industry.

32.     Baker was hired by MoneyTrax for the express purpose of exploiting his years of knowledge of LEAP's Proprietary Information.  Despite having no experience with MoneyTrax, Baker was instantly promoted as a prominent MoneyTrax National Trainer.  Given the similarity of positions Baker held for LEAP and MoneyTrax,  it is inevitable that Baker is using or will use LEAP's Proprietary Information for the benefit of MoneyTrax, and for its unjust enrichment.

33.     LEAP has received complaints from its licensees and/or corporate customers concerning solicitations they are receiving from MoneyTrax and/or Norman Baker. These individuals are not MoneyTrax licensees, and their names and positions as LEAP licensees are neither readily known nor published by LEAP.

34.    Apparently, MoneyTrax and/or Baker are contacting LEAP customers and licensees with advertisements, promotions and/or inducements in an effort to convince them to subscribe to the MoneyTrax System in lieu of the LEAP System.

35.    It appears that Baker has improperly disclosed and used the contact information for LEAP's licensees and corporate contacts, which he obtained while at LEAP, to send unsolicited advertisements for MoneyTrax including, but not limited to, the "MoneyTrax Opinion" to such licensees and corporate contacts.

36.    Baker's disclosure and use of LEAP's Proprietary Information for his own benefit and for that of MoneyTrax is a violation of his contractual and common law duties to LEAP, and is causing LEAP immediate and irreparable harm.

### Baker's Failure to Perform Under the Consultancy Agreement

37.    LEAP recently discovered that the software code of the LEAP software system created by Baker pursuant to the Consultancy Agreement is not in accordance with industry standards, including, but not limited to, failing to adhere to object naming conventions as recommended by Microsoft, improper use of global variables, and/or illogical groupings of code modules.

38.    In an attempt to fix the software provided by Baker, and while continuing to make Baker's payments in good faith, LEAP retained the services of certain computer experts. Those experts have attempted to fix, or "patch" the software to enable it to perform as intended. LEAP has expended considerable resources in the endeavor.

39.    The experts who have reviewed the infrastructure of the program and architecture of the software created by Baker have concluded that it was poorly and haphazardly

built, does not conform to industry standards, and is incapable of being successfully upgraded or repaired.

40.     The expense of rebuilding the software in a stable platform which would allow it to function as it was intended to function when delivered by Baker is estimated to be in excess of $400,000.

## MoneyTrax, Baker and LEAP

41.     Defendant MoneyTrax, together with Baker, have created materials, products, software, and/or training based upon LEAP's Proprietary Information designed to compete directly with LEAP.  In fact, these defendants have conducted seminars and training sessions which exploit, develop and teach concepts and materials consisting of LEAP's Proprietary Information.

42.     Evidencing its intent to profit from LEAP's Proprietary Information, MoneyTrax's website introduces and identifies Baker as a "key instructor" for seminars which are directly competitive with LEAP.

43.     In a plain effort to unfairly compete with LEAP,  MoneyTrax hired Baker.

44.     MoneyTrax also promotes Baker at seminars, and trades upon LEAP's goodwill and reputation through identifying Baker as an "industry leader" who gained his expertise working at LEAP, and with LEAP's president, Robert Castiglione.  Specifically, the website states:

> Norman Baker's past experience is legendary. He was instrumental in the development and design of the software for the LEAP system which is considered one of the finest systems in the industry. He has worked closely for more than 15 years with Bob Castiglione who is considered by many to be one of the brightest minds in the life insurance business.

45.     Baker's knowledge of LEAP's Proprietary Information now permits Baker and MoneyTrax to capitalize upon and improperly use the LEAP System.  At a seminar promoting MoneyTrax's competing system, the Circle of Wealth, Baker presented the Advanced Wealth Strategy series as MoneyTrax's new Chief Wealth Officer.  Baker's presentation necessarily contained certain of LEAP's Proprietary Information.

### MoneyTrax's Advertising

46.     Within recent months, LEAP has learned that MoneyTrax is promoting its competing Circle of Wealth system using advertising that contains false and/or misleading statements regarding the qualities of LEAP's system and MoneyTrax's Circle of Wealth System.

47.     MoneyTrax posted a "Comparison of LEAP and MoneyTrax" on its Web site which disparages LEAP and falsely and/or misleadingly advertises the attributes of MoneyTrax's and LEAP's systems.   A copy of this comparison is attached hereto as Exhibit C.

48.     The comparison of the "differences" contains numerous false and/or misleading statements including, but not limited to, the following:

a)     "LEAP has about a two-year learning curve. MoneyTrax can be purchased today and used tomorrow."

b)     "LEAP does not want you showing their system to other agents. MoneyTrax wants you to show and tell everyone you know."

c)     "LEAP makes you sign forms to keep you from talking to others. MoneyTrax utilizes no intimidation techniques."

d)     "LEAP has no online training available.  MoneyTrax Online University is available 24\7.

e)     "LEAP has been primarily a promoter of only whole life products. MoneyTrax promotes all fully funded permanent products."

f)     "LEAP teaches you concepts; you have to learn how to convey them. MoneyTrax teaches you concepts and helps you illustrate them."

g)      "LEAP is designed to help you sell more life insurance.  MoneyTrax will help you sell more of every financial product."

49.     MoneyTrax's claims are false an/or misleading and are damaging to LEAP's reputation and business.

50.     While LEAP's counsel demanded removal of the comparison on October 7, 2005, and repeated that demand numerous times, MoneyTrax did not remove the comparison for over three weeks.

51.     Currently, the Web page where the comparison was displayed states: "You are not authorized to view this resource.  You need to login."  A printout of this Web page dated November 11, 2005 is attached hereto as Exhibit D.  LEAP does not know who currently has a "login" to access this page.

52.     LEAP has no way of knowing how widely disseminated the comparison is, if MoneyTrax licensees are currently using it in the field against LEAP, or the incalculable harm that could be occurring to its reputation due to the false and/or misleading advertisement.

53.     MoneyTrax has also forwarded another announcement to  "LEAP producers" a/k/a LEAP licensees which states that:

> Many of you are aware of the fact that Bob Castiglione is suing Norman Baker. He has stopped paying Norman and is also suing MoneyTrax for allowing Norman to work with us. Bob Castiglione thinks we have a list of LEAP producers, but we do not, nor have we ever, focused our marketing efforts in the past on LEAP agents.  We do not know who is (or who is not) a LEAP producer - but you do.  I am willing to offer LEAP agents the "Deal of the Decade" in an effort to help my friend and yours, Norman Baker.
>
> I am so sure that Leap producers will like our software and doing business with our company that I am willing to cover the cost of their airfare to come to our "Back to School" basic training seminar in New Orleans on September 19th and 20th.  All attendees must register and pay the $500 for the two days of training and if they purchase the system while in New Orleans (at an already discounted

14

price of $1,500), I will waive the $500 training fee.  (The "Back to School Special" promotional discount, which is a great deal on it's own.)

In addition, if they show us their LEAP license I will reimburse their airfare up to $500.  (It is not even necessary that their LEAP license be current).   Even if they decide not to purchase the software, I will reimburse the cost of their airfare up to $500. (Leapers: please provide proof of plane fare cost.)

Here's the kicker: I am going to take the money generated from the sale of the "Circle of Wealth" system from every LEAP user at this meeting and give it to Norman to help him with his legal expenses against Bob Castiglione.  All of it.

If you understand opportunity cost you will not want to miss this great opportunity to increase your production and obtain some great tools, two days of training, free airfare, and help an old friend.  What a deal!

For more details, or to register for the event, visit the upcoming training section of our website by clicking here: http://www.moneytrax.com/training_upcoming.php#btzs

When registering, please type "LEAPER" in the comments field to let us know you are responding to this offer (and call of support for Norman).

P.S. Please forward this email to as many LEAP producers as you know.

Your friend and Norman's,
Don Blanton

54.     The announcement targets LEAP's licensees and promises to reimburse airfare costs if a LEAP license is shown to MoneyTrax.

55.     As a result of MoneyTrax's false, misleading, and deceptive advertising, LEAP has received numerous complaints from licensees in the field.

**COUNT I – BREACH OF CONTRACT**
**(Against Defendant Baker)**

56.     The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

57.     The Consultancy Agreement entered into by LEAP and Baker doing business as MAXE is a valid and enforceable contract.

58.      The Consultancy Agreement provided, inter alia, that Baker would "design, develop and update a computer software program . . . that expresses the concepts outlined in the Licensed Works and the Licensed System as [LEAP] shall from time to time request." Baker "acknowledge[d] that the services to be rendered by him are unique and personal . . ." and "agree[d] to not assign any of his rights or delegate any of his duties or obligations under this Agreement without the prior written consent of [LEAP]."

59.     It has recently come to LEAP's attention that that the software delivered by Baker contains significant flaws, does not meet industry standards, and must be rebuilt to assure its reliability.

60.     The acts described above constitute a breach of Baker's Consultancy Agreement.

61.     The expense of rebuilding the Software in a stable platform which would allow it to function as it was intended to function when delivered by Baker, is estimated to be in excess of $400,000.

62.     By the terms of the Consultancy Agreement, Baker is required to indemnify LEAP for the expenses "which arise in connection with any use or malfunction of the Software."

63.     As a result of Baker's conduct, LEAP has suffered injury in an amount to be determined at trial.

**COUNT II- BREACH OF CONTRACT**
**(Against Defendant Baker)**

64.    The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

65.    The Restrictive Covenant and Non-Disclosure Agreement attached to the Consultancy Agreement entered into by LEAP and Baker is a valid and enforceable contract.

66.    The Restrictive Covenant and Non-Disclosure Agreement provides that Baker "acknowledges that [LEAP] has valuable property rights in all of its methods, systems, analyses and concepts embodied in the LEAP System of the Company as such LEAP System is reflected in booklets, software or other tangible manifestations and as such LEAP System may be amended or supplemented from time to time, and also including, but not by way of limitation, any other methods, analyses, systems or concepts of the Company in connection with its financial and estate planning business . . ."

67.    The Restrictive Covenant and Non-Disclosure Agreement further provides that Baker will not do anything that would infringe upon, contest, or diminish the sole and exclusive property rights of LEAP in the LEAP System. Further, Baker agreed to keep all of LEAP's business information confidential and not to use such information other than solely on behalf of and for the benefit of LEAP.

68.    The acts described above constitute a breach of Baker's Restrictive Covenant and Non-Disclosure Agreement.

69.    Within the Restrictive Covenant and Non-Disclosure Baker expressly acknowledged that LEAP's "Business Information is unique and .. of substantial value to the Company and that a breach by him of any of the provisions of this Restrictive Covenant and Non-Disclosure Agreement will cause irreparable damage to the Company for which there is no adequate remedy at law.  Therefore, he acknowledge[d] that the Company shall be entitled to

preliminary and permanent injunctive relief to prevent any violation by him of any of the terms and provisions set forth here."

70.     The Restrictive Covenant and Non-Disclosure further provides that "should the Company institute suit against [Baker] for injunctive relief and/or damages for any breach of this Restrictive Covenant and Non-Disclosure Agreement, the Company shall be entitled to recovery from [Baker] the Company's reasonable attorney's fees and costs of any suit in which the Company is successful in whole or in part."

71.     The activities of Baker complained of herein have caused and unless restrained and enjoined by the Court will continue to cause irreparable harm, damage and injury to the plaintiff for which plaintiff has no adequate remedy at law.

72.     The activities of Baker complained of herein entitle LEAP to damages in an amount to be determined at trial and attorneys' fees and costs.

## COUNT III- BREACH OF CONTRACT
### (Against Defendant Baker)

73.     The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

74.     The LEAP System License entered into by LEAP and Baker is a valid and enforceable contract.

75.     Within the LEAP System License, Baker acknowledged LEAP's proprietary rights in its system and agreed to keep as confidential all information disclosed in connection with the LEAP System.

76.     Baker further agreed that if he breached the LEAP System License Agreement, LEAP would be entitled to preliminary and permanent injunctive relief against

Baker and damages in the stipulated amount of $300 per day for each day the breach or violation continued.

77.     The acts described above constitute a breach of Baker's LEAP System License Agreement.  As a result, LEAP is entitled to injunctive relief and stipulated damages of $300 per day for each continuing day of the breach or violation.

78.     The activities of Baker complained of herein have caused and, unless restrained and enjoined by the Court under the provisions of the Agreement, will continue to cause irreparable harm, damage and injury to LEAP for which LEAP has no adequate remedy at law.

## COUNT IV – TORTIOUS INTERFERENCE WITH FUTURE ECONOMIC ADVANTAGE
### (Against Defendants MoneyTrax and Baker)

79.     The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

80.     In order to secure sales and generate business for themselves, defendants have wrongfully misappropriated, disclosed, used, and continue to use and trade on LEAP's Proprietary Information to obtain licensees who otherwise would have become LEAP licensees.

81.     In addition, Defendant MoneyTrax has used LEAP licensee information, which was known and, upon information and belief, disclosed by Defendant Baker, to solicit and target LEAP licensees with newsletters, false and/or misleading advertisements, announcements and/or solicitations regarding MoneyTrax's system and seminars.

82.     As a result of defendants' conduct, LEAP has suffered injury and will continue to suffer injury to its business and property in the loss of business that it would have had, or expected to have, in absence of defendants' conduct.

83.     The acts undertaken by defendants constitute tortious interference with the prospective economic advantage of LEAP and have caused LEAP injury.

## COUNT V - MISAPPROPRIATION OF LEAP'S PROPRIETARY INFORMATION
### (Against Defendants MoneyTrax and Baker)

84.     The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

85.     Through extensive research and development, and the expenditure of considerable time, effort, and money, LEAP has developed its Proprietary Information.

86.     LEAP's Proprietary Information bestows a substantial competitive advantage over its competitors.  LEAP's Proprietary Information is not generally known or readily ascertainable by persons who could or would obtain economic value from its disclosure or use.  LEAP has taken steps to preserve the confidentiality of its Proprietary Information.

87.     LEAP has embodied its Proprietary Information in its written, spoken and audiovisual materials, and computer software, and the information constitutes a valuable commercial asset belonging to LEAP.  LEAP has kept its Proprietary Information confidential, and restricted its use and disclosure by all those to whom the information has become known.

88.     Given Baker's position with LEAP, and based on LEAP's trust and confidence, Baker was given access to LEAP's Proprietary Information.  He agreed to keep it confidential.

89.     Baker was privy to LEAP's Proprietary Information until his resignation in 2002.  Baker continued to receive updated LEAP information as a LEAP licensee up to 2004.  Some of the competitively sensitive information to which Baker was privy includes names and contact information for current LEAP licensees and corporate contacts, the latest LEAP

20

innovations and concepts (including the know how, technique and method of creating and implementing, inter alia, the LEAP software calculators,  LEAP's current money moves and concepts such as Spending the Death Benefit of Your Life Insurance Policy, Rental Income Move,  and inflation adjustment analysis).

90.    Prior to receiving such access, Baker knew nothing of LEAP's Proprietary Information, knew little of LEAP, its products, or the general industry of life insurance and financial planning, and learned of it only as a result of access granted by LEAP.

91.    Given the nature of LEAP's Proprietary Information, and of MoneyTrax's directly competitive business, Baker has breached the confidential relationship created by his contractual association with LEAP, and has or is likely to misappropriate and/or disclose confidential material given to him in reliance on that relationship.  It is inevitable that Baker will use and disclose LEAP's Proprietary Information to the benefit of himself and MoneyTrax, and to the detriment of LEAP.

92.    MoneyTrax has exploited Baker's extensive and current knowledge of LEAP's Proprietary Information for its own use and benefit.

93.    Indeed, recently Defendant MoneyTrax's newsletters have featured several new LEAP concepts and proprietary information, including but not limited to "Spending the Death Benefit of your Life Insurance Policy."

94.    Moreover, it appears that Baker has improperly disclosed and used the contact information for LEAP's licensees and corporate contacts, which he obtained while at LEAP, to send unsolicited advertisements for MoneyTrax.

95.    Defendants have used and are continuing to use LEAP's Proprietary Information, without authorization of LEAP, and to the detriment of LEAP.

96.     LEAP has suffered or is likely to suffer damages, and will continue to suffer serious and substantial damages resulting from defendants' acts of misappropriation, including irreparable injury for which there is no adequate remedy at law.

## COUNT VI – FALSE ADVERTISING
### (Against Defendant MoneyTrax, Inc.)

97.     The allegations of foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

98.     In connection with the offering of services and goods in interstate commerce, MoneyTrax has made materially false and/or misleading descriptions of fact in commercial advertisements concerning its Circle of Wealth system, LEAP's system, and/or LEAP.

99.     As noted herein, MoneyTrax has posted several false and/or misleading claims about its Circle of Wealth system, LEAP's system, and/or LEAP in its "Comparison of LEAP and MoneyTrax" posted at http://www.moneytrax.com/content/view/26/39/.

100.    MoneyTrax's false and/or misleading representations are material in that they are likely to influence purchasing decisions by consumers, and/or to cause confusion, mistake or deception.

101.    MoneyTrax's misrepresentations actually have deceived or have a tendency to deceive a substantial segment of its target audience.

102.    MoneyTrax's commercial advertising and promotion as complained of herein has been willful and deliberate and falsely represents the nature, characteristics, and qualities of its system, imbuing MoneyTrax's Circle of Wealth system with a marketability that it would not otherwise possess.

103.    Despite LEAP's repeated demands that MoneyTrax cease, MoneyTrax willfully and wantonly continued making the false and/or misleading claims in reckless disregard of LEAP's rights.   These acts entitle LEAP to treble damages and attorneys' fees pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117 (b).

104.    LEAP has been injured by reason of MoneyTrax's false and/or misleading representations, either by direct diversion of sales or by a lessening of goodwill associated with its services and/or products.  The activities of MoneyTrax have caused and, unless restrained and enjoined by the Court, will continue to cause irreparable harm, damage and injury to LEAP's reputation and goodwill for which LEAP has no adequate remedy at law.

### COUNT VII- DEFAMATION
### (Against Defendant MoneyTrax)

105.    The allegations of foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

106.    By the statements complained of herein, MoneyTrax has made false and defamatory statements of fact.

107.    MoneyTrax knew that the statements which it made, as specified herein, were false and acted with malice in making the statements.

108.    The statements made by MoneyTrax, as specified herein, concern LEAP and/or its LEAP System.

109.    The statements made by MoneyTrax, as specified herein, were communicated to LEAP and MoneyTrax licensees, prospective licensees, and/or, in the case of the Web site,  the general public at large.

110.    As a result of MoneyTrax's false and defamatory statements of fact, LEAP has been exposed to contempt and ridicule, and suffered damage to its business reputation, including lost profits from licensees and prospective licensees.

111.    As a result of MoneyTrax's false and disparaging statements of fact concerning LEAP's system, LEAP has suffered damage including lost profits from licensees and prospective licensees.

112.    As a consequence, LEAP has been damaged and, with respect to continuing violations, LEAP has no adequate remedy at law and therefore is entitled to injunctive relief.

## COUNT VIII – UNFAIR COMPETITION
### (Against Defendants MoneyTrax and Norman Baker)

113.    The allegations of foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

114.    Defendants MoneyTrax and Baker have exploited and/or used LEAP's Proprietary Information, to which MoneyTrax gained access only through Baker's knowledge obtained in his position with LEAP.

115.    The misappropriation by defendants of LEAP's Proprietary Information, and their use of same in competition with LEAP, constitutes unfair competition by defendants.

116.    The activities of defendants complained of herein have caused and unless restrained and enjoined by the Court will continue to cause irreparable harm, damage and injury to the plaintiff for which plaintiff has no adequate remedy at law.

117.    The activities of defendants complained of herein entitle LEAP to damages in an amount to be determined at trial and attorneys' fees and costs.

## COUNT IX--BREACH OF FIDUCIARY DUTY
### (Against Defendant Baker)

118.    The allegations of foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

119.    Baker, while associated with LEAP, was entrusted with preserving LEAP's Proprietary Information.

120.    Baker's position as LEAP's primary National software trainer was fiduciary in nature as he was entrusted with LEAP's Proprietary Information as a part of his confidential relationship with LEAP.

121.    Baker has used, and is continuing to use LEAP's Proprietary Information for the purpose of gaining benefits for himself and MoneyTrax.

122.    Baker has breached the fiduciary relationship between himself and LEAP through disclosure and use of LEAP's Proprietary Information.

123.    Defendants have unjustly profited from Baker's breach of confidentiality.

124.    As a result, LEAP has suffered and continues to suffer serious and substantial injury, including irreparable harm for which there is no adequate remedy at law.  Said breach will continue, to the irreparable injury of LEAP, unless enjoined by this Court.

## COUNT X – UNJUST ENRICHMENT
### (Against Defendants MoneyTrax and Baker)

125.    The allegations of the foregoing paragraphs of this Second Amended Complaint are incorporated herein by reference.

126.    Defendants, intending to harm the business of LEAP and benefit their own interests, committed actionable conduct and legal wrongs including, *inter alia*, the conduct and causes of action set forth earlier in this Second Amended Complaint.

127.    Defendants' actions caused injury to LEAP, and unjustly enriched defendants.

128.    By reason of the acts of the defendants, LEAP's business has been damaged substantially. LEAP has no adequate remedy at law unless defendants are enjoined and restrained.

## COUNT XI - DECLARATORY JUDGMENT
### (Against Defendant Baker)

129.    The allegations of the foregoing paragraphs of the Second Amended Complaint are incorporated herein by reference.

130.    Despite significant failures in the software provided by Baker pursuant to the Consultancy Agreement, Baker continues to demand payment for royalties under the Agreement.

131.    LEAP has expended considerable sums in an effort to repair the software, and expects to spend over $400,000 to rebuild the flawed software that Baker created, in breach of his obligations under the Consultancy Agreement.

132.    Moreover, Baker is in breach of his numerous obligations under the Restrictive Covenant and Non-Disclosure Agreement, which obviates LEAP's obligation to make any further payment to Baker.

133.    Accordingly, an actual controversy exists between the parties as to whether LEAP has any further obligations under the Consultancy Agreement, and whether the sums paid to Baker for faulty software should be returned.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff LEAP demands judgment in its favor and against defendants as follows:

1.      Damages, including stipulated and punitive damages;

2.      A preliminary and permanent injunction against the defendants, as to all counts where such relief is permitted by law;

3.      For an accounting;

4.      For an Order that all misappropriated materials in the possession, custody or control of defendants be delivered up for destruction;

5.      For an Order, in accordance with 15 U.S.C. 1118, that MoneyTrax deliver to LEAP, at MoneyTrax's expense, for destruction or other disposition, all advertisements, labels, signs, prints, packages, wrappers, receptacles, and all other promotional and other materials in the possession or control of MoneyTrax which bear or contain the false and/or misleading statements.

6.      For an Order that any and all other remedial and/or corrective measures that this Court deems appropriate, including but not limited to, requiring MoneyTrax to advertise retractions of the false and/or misleading claims in the same channels that said

advertisements were originally placed and requiring that MoneyTrax send written notice to each

of its customers from whom it has received an order for its  Circle of Wealth system informing

the customers of MoneyTrax's unfair, false, misleading and/or deceptive advertising claims.

      7.        Costs of suit;

      8.        For an Order declaring that LEAP's obligations under the

Consultancy Agreement are null and void, that no further payments are due under the Agreement

from LEAP to Baker and that all payments made to Baker under the Agreement shall be repaid

from Baker to LEAP;

      9.        Awarding pre- and post-judgment interest on all such amounts,

according to law;

      10.        LEAP's attorney's fees; and

      11.        Such other and further relief as the Court deems just and proper.

Dated:  January 3, 2006

s/ Melissa L. Klipp (MK-7772)
Melissa L. Klipp (MK-7772)
Robert M. Leonard (RL-9768)
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, NJ 07932-1047
Phone: (973) 360-1100
Fax: (973) 360-9831
melissa.klipp@dbr.com
Attorneys for Plaintiff
LEAP Systems, Inc.