# EXHIBIT A

AGREEMENT

AGREEMENT, dated as of this 1st day of January, 1991, by and among EXECUTIVE ASSET MANAGEMENT, INC., incorporated and existing under the State of New Jersey and doing business at 32 Fairway Drive, Greenbrook, New Jersey 08812 ("EX/AM),

** and **

NORMAN BAKER (BAKER) doing business as MAXE SOFTWARE ("MAXE"), an unincorporated association, doing business at 215 N. University, Nacogdoches, Texas 75963.

WHEREAS, EX/AM is the sole and exclusive owner of (1) certain proprietary information and know-how relating to a unique life insurance and financial planning system, The LEAP System (the "Licensed System"), (2) certain written or other tangible material including various pamphlets, worksheets, product sheets, video tapes, written tracts and other materials (the "Licensed Works") which express the Licensed System verbally, graphically, pictorially, or otherwise and (3) certain trademarks and trade names used in connection with the Licensed System and the Licensed Works, namely, "The LEAP System" and the PS&G Study" (the Licensed Marks") ; and

WHEREAS, BAKER has developed and will promote on behalf of EX/AM on a nonexclusive basis throughout the United States, a computer software program that expresses certain aspects of the Licensed System, the Licensed Works and the Licensed Marks, and BAKER desires to perform such services for EX/AM as an independent contractor for hire upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. Appointment: EX/AM hereby appoints BAKER as a computer software consultant and nonexclusive sales representative, and Baker hereby accepts such appointment, on the terms and conditions of this Agreement.

2. Duties: BAKER's duties shall be as follows:

(a) Baker agrees to design, develop, and update a computer software program (the "Software"), in such manner at all times as will not infringe any copyright or other proprietary right of any third party, that expresses the concepts outlined in the Licensed Works and the Licensed System as EX/AM shall from time to time request.

(b) So long as this Agreement is in effect, BAKER agrees to use his best efforts to solicit certain Licensed System licensed third parties to purchase Software licenses from EX/AM to use the Software in accordance with any reasonable requirements established from time to time by EX/AM and on terms acceptable to EX/AM. BAKER agrees not to contact any nonlicensed third parties regarding a Software license to use the Software without the prior written approval of EX/AM.

(c) BAKER agrees to inform EX/AM on a regular basis concerning his activities and progress in developing the Software and in soliciting approved Licensees to purchase licenses to use the Software. Baker will not have the right to deliver the Software to any party without the permission of EX/AM. This permission must be made by EX/AM in writing to BAKER.

*[signature] 1/20/91*

(d) BAKER shall have no authority to accept or negotiate any offer or to assume or create any obligation, express or implied, on behalf of EX/AM except as specifically authorized in writing in advance by EX/AM. BAKER shall only make such representations and warranties regarding the Licensed System as are specifically authorized in writing in advance by EX/AM.

(e) At no additional cost to EX/AM, BAKER agrees to provide each potential Licensee of the Software who has signed a License Agreement with EX/AM relating to the Software for one training session, telephone assistance, a copy of the Software, a manual, and other pertinent information necessary for the operation of the Software.

(f) Baker shall provide to EX/AM, within 30 days of the date of this Agreement, a working copy of the Software, a user's manual, the source code, programming notes, and other necessary items so as to enable EX/AM to reproduce the Software. EX/AM will not reproduce the Software as long as Baker provides copies of the Software to EX/AM under the terms and provisions of this Agreement. Baker will send EX/AM the latest updated version of the Software, the source code and notes and other necessary items to reproduce the Software, at least once every six months.

(g) BAKER, at his sole cost and expense and at no cost or expense to EX/AM, agrees to arrange for and be responsible for all planning, production, design, redesign, updating from time to time, storage and distribution of the Software and any physical embodiment of the Software and any physical programming of the computer of any licensees, at all times in such manner as shall not infringe any copyright or other proprietary right of any third party.

3. Independent Contractor: BAKER is retained by EX/AM only to the extent set forth in this Agreement and his relation to EX/AM during the term of this Agreement is solely that of an independent contractor. BAKER shall not have employee status or be entitled to participate in any employee benefit program established by EX/AM. Baker is responsible for all of his agents and employees in all respects, even though these employees and agents may be involved in the creation or distribution of the Software.

4. Compensation:

(a) In total consideration for all his services, EX/AM shall pay to BAKER a commission in an amount equal to fifty percent (50%) of the gross Software license fee paid by each Licensee. Baker will not receive any other commissions from any other source of revenue of EX/AM unless specifically written and agreed to by both BAKER and EX/AM. Any disagreement as to what constitutes the gross Software License Fee paid will be resolved by EX/AM, to the extent reasonable, it is hereby agreed that such resolution shall be binding on BAKER.

(b) At any time, Baker may notify EX/AM that he will no longer supply EX/AM with the duties and services mentioned in 2 (a) (b) (c) (d) (e) (f) and (g) above. This notification must be in writing to EX/AM by certified mail. Once EX/AM receives such notification, then BAKER will receive compensation for each future sale of the Software in the amount of 10% of the gross Software License Fee. If BAKER remains as a consultant during this time and after such notification, Baker will receive an additional 5% commission for each Software sold.

(c) Baker agrees that there will not be compensation on current or future Software sales in the event that Baker has been terminated for damages to EX/AM due to fraud, copyright infringement, malfunctions of the Software, and similar events that cause EX/AM financial loss or future sales.

(d) In the event of death or disability to Baker, EX/AM will pay the heirs and or successors to BAKER the standard 10% commission on all gross Software License Fees. If the heirs and or successors to BAKER can and are willing to provide full services as mentioned in paragraph 2a through 2g above which are satisfactory to EX/AM, then EX/AM will continue the full compensation at the 50% rate as stated above. If the services are not satisfactory, a percentage amount of compensation will be negotiated beteen the heirs and successors of BAKER and EX/AM.

(e) A commission will be deemed earned and payable to BAKER within sixty days after EX/AM receives payment of the Grosss Software License fee from the Licensee in accordance with the terms of this Agreement.

5. Expenses: Without limiting any of the foregoing of this Agreement, Baker shall be solely responsible for all of his costs and expenses incurred in his performance of his duties under this Agreement, including but not limited to, expenses for equipment, supplies, transportation, programming time, telephone, entertainment and secretarial assistance.

6. Ownership of Software: Baker agrees that EX/AM will own all right, title, and interest in and to the Licensed System, the Licensed Works, the Licensed Marks, and the Software, including any trademark or copyright registrations or applications therefor and any tangible embodiment thereof. BAKER agrees not to contest or impair EX/AM's ownership interests in such property either directly or indirectly. Without any further consideration, BAKER hereby assigns to EX/AM any all rights he may acquire with respect to the Software and will execute and deliver to EX/AM all instruments necessary or appropriate to give effect to the foregoing and for any patent or copyright registration of the Software in the United States or any foreign country. Without limiting the foregoing, should BAKER develop any computer software program during the term of this Agreement which in no respect is an improvement, modification, revision, or update of the Software and which does not express any concepts pertaining to any of the Licensed System, the Licensed Works, or the Licensed Marks, BAKER shall continue his own ownership of such new computer software program and at the request of EX/AM shall appoint EX/AM as nonexclusive sales representative for such computer software program on substantially similar terms as set forth in this Agreement.

7. Restrictive Covenant and Non-Disclosure Agreement:

Baker agrees to execute and deliver, simultaneously and as part of this Agreement, the Restrictive Covenant and Non-Disclosure Agreement in the form attached hereto as Exhibit A, the terms of which are incorporated herein by reference.

8. Term and Termination: (a) This Agreement shall remain in effect for two years from the date hereof and shall automatically renew itself for subsequent one year periods. This Agreement is terminable at any time for cause by EX/AM. EX/AM shall have cause for termination of this Agreement only for the following: (i) if Baker fails to deliver copies of the Software to EX/AM or to the Licensees of EX/AM after 45 days after Baker has received notice for such a copy of the Software to be delivered to EX/AM or the Licensee of EX/AM, (ii) if BAKER fails to modify, improve, or update the Software according to the requests of EX/AM for such modifications, improvements, or updates, however, the modifications, improvements, and updates must be of a reasonable nature in order to sustain the Software as a marketable product to the Licensees. (iii) if BAKER fails to respond to the reasonable requests of EX/AM in a timely manner for which such a request can be expected to be completed by other similar subcontractors. (iv) if BAKER is in breach of this Agreement or Restrictive Covenant and Non-Disclosure.

(b) After termination of this Agreement, BAKER shall continue to receive such commissions as are payable to him in accordance with the terms of this Agreement as a result of payments to EX/AM under licensing agreements signed by Licensees for the Software prior to the effective date of termination, unless Baker has been terminated for items explained in paragraph 4(c).

9. **Warranty:** BAKER represents and warrants that he is not a party to, subject to or bound by any agreement, oral or written, or any judgement, order, writ, injunction, or decree of any court, governmental body or arbitrator which would conflict with or be breached by the execution or performance by Baker of this Agreement or which could prevent the carrying out of this Agreement. BAKER also represents and warrants that the Software does not now, and will not at any time after the date hereof, infringe or violate in any respect any copyright, patent or other Proprietary right of any third party.

10. **Indemnification:** BAKER shall indemnify and hold harmless EX/AM and all employees or other agents of EX/AM, from and against any and all damages, claims losses, liabilities and expenses which may arise out of the misconduct or negligence of BAKER or his agents or the breach by BAKER of any term of this Agreement, or which arises in connection with any failure of or inaccuracy in any representation or warranty of BAKER in this Agreement, or which arise in connection with any use or malfunction of the Software.

11. **Entire Agreement:** This Agreement constitutes the entire understanding and agreement of the parties hereto and supersedes all other prior agreements and understandings, whether written or oral, between the parties hereto. Nothing in this Agreement shall require EX/AM to enter into any agreement with any potential Licensees, nor preclude EX/AM from acting as to any potential Licensee in any manner as EX/AM may in its absolute discretion determine.

12. **Modification:** This Agreement may not be amended or modified except by a writing signed by both parties.

13. **Waiver:** No waiver by either party of any breach of any provision of this Agreement shall be deemed a waiver of any other breach of such provision or any other provision of this Agreement.

14. **Notices:** All notices hereunder shall be in writing and shall be deemed to have been given when delivered by hand or when mailed by certified mail, return receipt requested, to a party at the address stated on page one of this Agreement.

15. **Assignment:** BAKER acknowledges that the services to be rendered by him are unique and personal. Accordingly, BAKER may not assign any of his rights or delegate any of his duties or obligations under this Agreement without the prior written consent of EX/AM. The rights and obligations of EX/AM under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of EX/AM.

16. **Law Governing:** This Agreement shall be construed and interpreted according to the laws of the State of New Jersey.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

EXECUTIVE ASSET MANAGEMENT, INC.

BY _____
Robert Castiglione, President

NORMAN BAKER

BY _____
Norman Baker of MAXE Software      9/20/91

## EXHIBIT A

### RESTRICTIVE COVENANT AND
### NON-DISCLOSURE AGREEMENT

Executive Asset Management, Inc., a New Jersey corporation (hereinafter the "Company"), has at the request of the undersigned, agreed to enter into an Agreement dated as of January 1, 1991, with the undersigned pursuant to which the undersigned will perform certain services for the Company (hereafter the "Agreement").

The undersigned acknowledges that the Company has valuable property rights in all of its methods, systems, analyses and concepts embodied in the "The LEAP System" of the Company as such LEAP System is reflected in booklets, software or other tangible manifestations and as such LEAP System may be amended or supplemented from time to time, and also including, but not by way of limitation, any other methods, analyses, systems or concepts of the Company in connection with its financial and estate planning business (all of the foregoing collectively referred to herein as "Business Information"), and that, during the term of the Agreement, the Company will be disclosing and making available to the undersigned various Business Information from time to time for his use in furtherance of the business of the Company.

In consideration of all of the foregoing, and in particular the agreement of the Company to enter into the Agreement with the undersigned and the disclosure to him from time to time of such Business Information in furtherance of the business of the Company, the undersigned covenants and agrees that:

(a) Any and all Business Information disclosed at any time to the undersigned by the Company or any of its representatives constitutes valuable property of the Company in which the Company has exclusive ownership rights, and the undersigned shall not, at any time, do anything to infringe upon, contest, or diminish the sole and exclusive property right of the Company in such Business Information;

(b) The undersigned will hold solely for the Company's benefit, will promptly disclose to the Company, and, without any additional consideration or compensation, will and hereby does assign to the Company, all of his right, title and interest in and to all improvements to, or discoveries, new concepts, writings, designs, tangible manifestations, and work product of all kinds (whether tangible or intangible, and whether copyrightable or patentable) relating to, any and all Business Information (including, but not by way of limitation, relating to said LEAP System) made, participated in, conceived

*9-21-91*

or reduced to practice by the undersigned, either alone or jointly with others, during the term of the Agreement.

(c) Except as solely required in order to carry on and further the business and economic interest of the Company, the undersigned, at all times during the term of the Agreement and thereafter (regardless of the cause of the termination of the Agreement, whether voluntary or involuntary), shall keep confidential, and shall not divulge to any other person, entity, partnership, corporation or association, any Business Information disclosed to or obtained by the undersigned at any time during the term of the Agreement;

(d) The undersigned shall use all Business Information only in connection with providing services for and on behalf of the Company and as expressly authorized by the Company; and at no time, whether during the term of the Agreement or thereafter (regardless of the cause of the termination, whether voluntary or involuntary) shall the undersigned use any such Business Information disclosed to or obtained by the undersigned during the term of the Agreement, in the furtherance of any business activity or business interest of the undersigned relating to financial or estate planning, counseling or consulting other than solely on behalf of and as authorized by the Company;

(e) The undersigned shall not reproduce, copy, distribute or circulate any of the Business Information without the express prior written consent of the Company, and upon any termination of the Agreement, for any reason and at any time, he shall immediately return to the Company all booklets, software or other tangible manifestations embodying any of the Business Information (including any of said LEAP System) and all copies thereof.

The undersigned acknowledges that:

(a) The Business Information is unique and (in the aggregate and individually) of substantial value to the Company, and that a breach by him of any of the provisions of this Restrictive Covenant and Non-Disclosure Agreement will cause irreparable damage to the Company for which there is no adequate remedy at law. Therefore, he acknowledges that the Company shall be entitled to preliminary and permanent injunctive relief to prevent any violation by him of any of the terms and provisions set forth herein; and

(b) Should the Company institute suit against him for injunctive relief and/or damages for any breach of this Restrictive Covenant and Non-Disclosure Agreement, the Company shall be entitled to recovery from the undersigned the Com-

pany's reasonable attorneys' fees and costs of any suit in which the Company is successful in whole or in part.

The undersigned further agrees that the State of New Jersey shall be the sole and exclusive judicial forum for any cause of action arising under or relating to this Restrictive Covenant and Non-Disclosure Agreement. By executing this Restrictive Covenant and Non-Disclosure Agreement, he submits generally to the jurisdiction of the courts of the State of New Jersey and agrees that service of process may be made upon him in accordance with the Rules of Court of the State of New Jersey.

THE UNDERSIGNED ACKNOWLEDGES THAT THE COMPANY HAS EMPHASIZED TO HIM THE IMPORTANCE OF THIS RESTRICTIVE COVENANT AND NON-DISCLOSURE AGREEMENT, AND THE SIGNIFICANCE OF ITS PROVISIONS, PRIOR TO HIS ENTERING INTO THE AGREEMENT, AND HAS ENCOURAGED HIM TO HAVE LEGAL COUNSEL REVIEW THIS RESTRICTIVE COVENANT AND NON-DISCLOSURE AGREEMENT WITH HIM. THE UNDERSIGNED ACKNOWLEDGES THAT HE UNDERSTANDS THE PROVISIONS OF THIS RESTRICTIVE COVENANT AND NON-DISCLOSURE AGREEMENT AND ENTERS INTO IT VOLUNTARILY.

IN WITNESS WHEREOF, the undersigned has caused this Restrictive Covenant and Non-Disclosure Agreement to be executed on this 1st day of _____.

_____

WITNESS:

_Todd Langford_

9-21-91